IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br><br>ORAN DONALD INGRAM, and<br>LINDA JANE INGRAM,<br><br>Debtors. | Chapter 7<br><br>Case No. 03-21972-PHX-SSC<br><br>Adversary No. 04-1022 |
| ORAN DONALD INGRAM, and<br>LINDA JANE INGRAM,<br><br>Plaintiffs,<br>v.<br><br>PERFORMANCE FUNDING, LLC.,<br><br>Defendant. | |
| PERFORMANCE FUNDING, LLC,<br><br>Counter Plaintiff,<br>v.<br><br>ORAN DONALD INGRAM, and<br>LINDA JANE INGRAM,<br><br>Counter Defendants. | MEMORANDUM DECISION<br><br>(Opinion to Post) |

**I. PRELIMINARY STATEMENT**

After this Court conducted oral argument on Performance Funding's Motion for Summary Judgment on its Counterclaims and to dismiss the Debtors' underlying complaint on April 11, 2005, this Court ruled preliminarily in favor of Performance Funding, but noted that additional documentation would need to be presented by the party on the issue of damages to have a judgment entered in favor of Performance Funding on its Counterclaim. The Court set a briefing deadline for the parties at the April 11, 2005 hearing; however, a number of Motions were subsequently filed by the parties. Performance Funding filed a

timely Affidavit in support of its claim for damages and a Motion for Attorneys' Fees. The Debtors responded with a Motion to Extend as to any controverting affidavit they wished to present, which Motion was objected to by Performance Funding. The Debtors also responded to the Motion for Attorneys' Fees, but the essence of that Response was more to the merits of the underlying Motion for Summary Judgment. Performance Funding replied to that Response. Finally, the Debtors also filed a Motion to Amend Findings of Fact and Conclusions of Law, attempting to persuade this Court that it should alter or amend its decision on the record on April 11, 2005. A series of pleadings were then filed by the parties which were inconsistent with the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure. Performance Funding filed an Objection to Debtors' Motion to Amend, the Debtors filed a Response to the Objection, and Performance Funding filed a Reply to the Debtors' Response to the Objection.

The decision on the various Motions is set forth hereinafter. This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157 (West 2005).

## II. FACTUAL DISCUSSION

Performance Funding and Spec Interiors, Inc. ("Spec") entered into a Factoring and Security Agreement ("Agreement") as of June 14, 2001.[1] At the same time, the Debtors entered into an unconditional guarantee of payment ("Guarantee")[2] of the obligations which might arise under the Agreement, which Guarantee was secured by a deed of trust on the Debtors' residence ("Deed of Trust").[3] Therefore, as of June 14, 2001, the Debtors agreed

---

**1** Performance Funding's Separate Statement of Facts filed in support of its Motion for Summary Judgment, Docket Entry No. 6 , Ex. A thereto.

**2** Id., Ex. B.

**3** Id., Ex. C.

2

Case 2:04-ap-01022-SSC    Doc 41    Filed 09/28/05    Entered 09/28/05 16:16:32    Desc
Main Document      Page 2 of 16

to guarantee the payment of any obligation that might arise under the Agreement, and the Debtors entered into the Deed of Trust on their residence as collateral for the repayment of the obligations.[4]

Under the Agreement, Spec agreed to sell, and Performance Funding agreed to purchase, certain accounts or accounts receivable which were "eligible." Spec could not sell more than the aggregate amount of $150,000 in Eligible Accounts.[5] The nature of this Agreement was to provide immediate funding to Spec to assist it in its cash requirements, but the financing was short-term in nature. In essence, Spec was selling certain assets it held - its accounts or accounts receivable - to Performance Funding, and the customers which owed Spec money for services Spec provided were then to pay Performance Funding instead. If Performance Funding was paid within 90 days of the payment to Spec, Performance Funding charged a standard fee. If Performance Funding did not receive payment from Spec's customers until day 91 or later, Spec agreed to pay a late charge.[6]

The Agreement provided that if Spec received payments from the customers, by mistake or otherwise, on any of the Eligible Accounts, Spec had the obligation to turn over those funds immediately to Performance Funding.[7] If Spec did not so act, Performance Funding could require Spec to repurchase the unpaid amount, together with any fees or costs, on any previously purchased Eligible Accounts.[8] Given the broad definition of "Late

---

[4] The only difference between the obligations entered into under the Agreement and the Guarantee was Spec agreed to pay any attorneys' fees arising in any way under the Agreement (Ex. A, at 12, Paras. 24.0 and 24.15.2), and in the Guarantee, the Debtors only agreed to pay reasonable attorneys' fees that might be incurred by Performance Funding (Ex. B at Para. 10).

[5] Performance Funding's Statement of Facts, Ex. A, at 4, Para. 2.1.3.

[6] Id., also see the terms defined at 2. In particular, "Factoring Fee Period," Factoring Fee Rate," "Factoring Fee" (to be determined by multiplying the Rate by the Face Amount of the Eligible Accounts), and "Late Charge." Late Charges are further delineated at 5, Para. 4.8.

[7] Id. at 9, Para. 9.7.

[8] Id. at 6, Para. 5.1.

3

Charge," such charges accrued at a higher rate on any obligations that remained unpaid. Moreover, other provisions in the Agreement stated that a failure of Spec to pay the obligations arising under the Agreement constituted an Event of Default,[9] and late charges were payable, on demand, on any obligations not paid thereunder.[10]

However, one provision of the Agreement required Performance Funding to provide an "Account Stated," if it desired to bind Spec to any obligations then due and owing.[11]

Pursuant to this Agreement, Spec sold Server Group Eligible Accounts to Performance Funding on June 14, 2001, and received a cash payment of $142,037.01. On June 15, 2001, Spec received payment from the Server Group on the same Accounts in the amount of at least $142,037.01. Performance Funding sent a letter to Spec on August 24, 2001, notifying Spec that Performance Funding had just been notified, presumably by the Server Group, that Spec had received payment on the Eligible Accounts on the very same day that Spec had sold the Accounts to Performance Funding.[12]

The parties agree that on September 28, 2001, Mr. Ingram and Mr. Wallace had a meeting concerning the unpaid obligations due and owing by Spec to Performance Funding. Because of the Guarantee, the Debtors were also liable to Performance Funding. At the time of the meeting, Mr. Ingram paid the sum of $140,721.74. In his Affidavit in support of the Motion for Summary Judgment, Mr. Wallace stated that Mr. Ingram wanted a release of the obligation then due and owing by the Debtors, under the Guarantee, to Performance Funding. Mr. Wallace refused the request for a release. Mr. Wallace told Mr. Ingram that the Debtors still owed $15,731.50. Mr. Wallace apparently did not present any

---

**9** Id. at 10, Para. 13.12.

**10** Id. at 10, Para. 13.14.2.

**11** Id. at 11, Para. 14.0

**12** Performance Funding's Statement of Facts, Ex. G. Also, see Lou Wallace's affidavit in support of Motion.

4

written Account Stated to Mr. Ingram at the time, since there is nothing in the record to reflect as such. Mr. Ingram has provided several affidavits with the Motions recently filed by the Debtors with this Court. However, the Debtors offer no written documentation reflecting that the parties entered into a release that day upon the payment of $140,721.74 by the Debtors.

On December 5, 2001, counsel for Performance Funding sent a demand letter to Spec, stating that as of December 10, 2001, the sum of $21,213.97 was still due and owing to Performance Funding.[13] If Performance Funding did not receive payment by that date, Performance Funding intended to proceed against the Debtors with the foreclosure of the Deed of Trust as to the Debtors' residence.[14] Counsel for Performance Funding does not mention any Misdirected Payment Fee then due and owing under the Agreement or the Guarantee.

On March 18, 2002, counsel for Performance Funding filed a complaint against the Debtors to foreclose on the Deed of Trust.

On April 28, 2002, the sum of $9,632.97 was paid by Performance Restaurants to Spec and Performance Funding.[15] Performance Funding provided a credit of $9,632.97 to Spec, and the Debtors and reduced the outstanding obligation as a result of this payment. Spec and the Debtors still owed the amount of $21,674.85. Again, no Misdirected Payment Fee was requested. Ed Fochtman stated in his affidavit that he met with Mr. Ingram and then with Mr. Hrudka, another principal of Performance Funding, to determine if the services of Mr. Ingram and/or one of his companies might be utilized by Performance Restaurants, a related entity to Performance Funding. Mr. Ingram would be paid for his costs associated with the performance of services for the Restaurant Company, and the profit in the contract, normally paid to Mr. Ingram or his company, would be paid to Performance Funding

---

**13** Performance Funding's Statement of Facts, Ex. H.

**14** Id.

**15** Affidavit of Ed Fochtman in support of Motion for Summary Judgment, Exhibits attached thereto.

5

in reduction of the Debtors' liability under the Guarantee. The Exhibits attached to Mr. Fochtman's Affidavit support his statement of the facts. For instance, the services rendered by Spec are set forth in the attached invoices, and one of the attached checks is made payable to Mr. Ingram, and the other check is a joint check made payable to Spec and Performance Funding. The Debtors have presented no documentation to controvert what Performance Funding has provided.

The Debtors filed their bankruptcy petition on December 17, 2003, and they commenced this adversary proceeding on September 8, 2004.

After the payment was received from Performance Restaurant on behalf of Mr. Ingram and Spec, Performance Funding dismissed its then pending action to foreclose the lien on the Debtors' residence. The Debtors attempted post petition, in 2004, to settle with Performance Funding upon the payment of $5,000, but there is no evidence in the record that Performance Funding accepted the settlement.

After reviewing all of the documentation submitted by Performance Funding in its original Motion for Summary Judgment and in its subsequent Motions, the only information as to an accounting of the obligations owing by Spec is provided in Exhibit D to the original Motion.[16] However, this accounting of unpaid obligations, and any payments received thereon, was prepared as of November 30, 2004, after the Debtors had filed their bankruptcy petition. The Court has concerns about utilizing this post-petition document, and there is simply nothing in the record which reflects that when Performance Funding originally became aware of the default by Spec, it sent any kind of an Account Stated to Spec.

The Debtors' current pleadings focus essentially on one factual point. The Debtors believe that in June or July 2001, Mr. Ingram entered into a separate contract with Mr. Wallace, whereby one of Mr. Ingram's companies, Del Ray Plastering, would perform stucco work on Mr. Wallace's home. The Debtors argue that this contract provided sufficient funding, along with the refinancing that would later occur as to their residence, to pay off any

---

[16] Performance Funding's Statement of Facts, Ex. D.

obligation that Spec or the Debtors owed to Performance Funding. The Debtors state that the consideration under the contract was for $20,000, of which the sum of $10,000 was to be credited toward the obligation then due and owing by Spec and the Debtors to Performance Funding. The Debtors have no documentation to support their position - no invoices, no correspondence, no deposit slips or checks, no books and records from Del Ray Plastering. Mr. Wallace has provided his own affidavit to refute the allegations made by the Debtors, insisting that he alone entered into an agreement with Mr. Ingram's company, Del Ray Plastering. Mr. Wallace stated that he contracted, in July 2001, to have stucco placed again on the exterior of his residence, that Performance Funding was not involved in the transaction, that he agreed to pay $10,000 to $12,000 for the services to be rendered, that he believed that Del Ray Plastering was a licensed contractor, and that he paid $5,000 to Spec for the work to be done by Del Ray Plastering, with the balance to be paid upon completion, that Del Ray Plastering did not complete the job, and that Mr. Wallace was required to hire another contractor to complete the work. Mr. Wallace provides no documentation in support of his position.

### III. LEGAL DISCUSSION

A. Motion to Extend of the Debtors.

The Debtors' Motion to Extend shall be granted. At the April 11 oral argument on Performance Funding's Motion for Summary Judgment, this Court had set the dates to obtain additional information from Performance Funding and the Debtors as to the computation of damages based upon a discussion with counsel. The Court established these dates on relatively short notice. Therefore, the Debtors' request to extend briefly the time period to respond was not unreasonable. Nor is the Court able to perceive any prejudice to Performance Funding if such a brief extension is granted. Ninth Circuit law dictates, under such circumstances, that the brief extension of time be granted. Fed. R. Bankr. P. 9006; In re Sheehan, 253 F.3d 507 (9th Cir. 2001); In re Sonoma V, 703 F.2d 429 (9th Cir. 1983)

B. Motion for Attorneys' Fees.

The Court has reviewed Performance Funding's Motion for Attorneys' Fees and the response and reply filed and served by the parties with respect thereto. The thrust of the Debtors' responsive pleading is that the Court determine that the attorneys' fees and costs are reasonable. The Debtors also believe that if their argument that Performance Funding was paid in full, as advanced in their Motion to Amend, is accepted by the Court, then the attorneys' fees and costs should be concomitantly reduced as a result of such a finding.

There is an ambiguity in the documentation as to the standard that this Court should apply to Performance Funding's request for attorneys' fees and costs. On the one hand, as noted in the factual discussion, supra, the Agreement provides that Performance Funding is entitled to attorneys' fees and costs, in any amount incurred, related in any way to the underlying transaction. However, the Guarantee provides that the Debtors are only responsible for the reasonable attorneys' fees and costs incurred by counsel. In resolving this conflict, the Court will utilize the documentation which specifically pertains to the Debtors - the Guarantee.

The Court has now had an opportunity to review the detailed billing statements attached to the Motion. These entries were made on a contemporaneous basis over the years of the dispute between the parties. Unfortunately, because this matter has not been resolved, counsel for Performance Funding continues to incur attorneys' fees and costs. Based upon this Court's thorough review of counsel's invoices, it concludes that the attorneys' fees and costs requested by counsel are reasonable.

The Debtors also advance the argument that if this Court grants the Motion to Amend, which will be discussed hereinafter, counsel for Performance Funding should have its attorneys' fees and costs reduced; that is, the lack of success in advancing certain arguments should affect whether counsel's fees and costs are, indeed, reasonable. However, since the Court will not accept most of the Debtors' arguments in the Motion to Amend, the Court sees no basis to reduce the attorneys' fees and costs of Performance Funding's counsel.

8

C. The Debtors' Motion to Amend.

The June/July 2001 Del Ray Plastering Contract is the focus of the Debtors' Motion to Amend. The Debtors argue that this Contract represents a payment by Mr. Wallace to Spec to reduce the payment owing by the Debtors to Performance Funding. There are several problems with the Debtors' argument.

In June or July 2001, Spec had just entered into the Agreement with Performance Funding. In fact, although interest was accruing on the funds advanced by Performance Funding to Spec, the Agreement contemplated that the Spec customers might not pay Performance Funding for as long as 90 days. Since the Server Group Eligible Accounts were purchased by Performance Funding on June 15, 2001, only 15 to 30 days had elapsed, at the most, at the time that Mr. Wallace and Mr. Ingram were discussing the terms and conditions of the Contract to re-stucco Mr. Wallace's home. The evidence reflects that Mr. Wallace and Performance Funding did not become aware that there was a problem with the payment of the Server Group Eligible Accounts until the middle of August, when Mr. Wallace sent his letter to Spec, advising Spec of the diversion of the Server Eligible Accounts to Spec rather than Performance Funding. In essence, it was only in August 2001 that Performance Funding was aware of, and focusing on, the misdirection of the customer payments on the Accounts to Spec. There was no payment default yet; the obligation between Performance Funding and Spec was on a current basis, with interest accruing at the contract rate on any obligation then due and owing. Because no Event of Default had been triggered under the Agreement, the Debtors did not yet have any obligation that was due and owing under the Guarantee for which they would need to negotiate with Mr. Wallace as to any payment.

Thus, from a factual standpoint, the Debtors' argument makes no sense. Under Ninth Circuit law, if a party is attempting to refute a motion for summary judgment, and the argument presented is implausible, the party must present more persuasive or cogent evidence in support of the party's position <u>California Architectural Bldg. Prods., Inc., v.</u>

9

Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 1356 (1986)). The Debtors have failed to present the necessary evidence, other than Mr. Ingram's self-serving affidavit, in support of their implausible argument. As a result, the Court concludes that the Debtors have failed to raise a genuine issue of material fact as to the Del Ray Plastering Contract which would require a further evidentiary hearing before this Court. The Court concludes that Mr. Wallace entered into the Contract with Del Ray Plastering and that there is no competent evidence to support the Debtors' claim that any or all of the proceeds from this Contract were to be utilized to pay the obligation of the Debtors to Performance Funding.

The Debtors' Motion to Amend also raises the issue of the Debtors' affirmative defenses and how those should be handled by this Court at the pleading stage. Since the Debtors are presenting the affirmative defenses of payment or satisfaction, they carry the burden of proof on any such defenses. Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Harper v. Delaware Valley Broadcasters, Inc., 743 F.Supp. 1076; Pfeil v. Smith, 183 Ariz. 63, (Ariz.App. Div. 1,1995). The Debtors have failed to present any evidence, other than their self-serving affidavits, that the series of payments made by them over the years somehow paid Performance Funding in full or that Performance Funding was satisfied. As noted, this Court has already rejected the Debtors' argument that the Del Ray Plastering Contract could serve as a basis of the repayment of the subsequent obligation of the Debtors under the Guarantee. Performance Funding's Motion for Summary Judgment also includes various letters from the Debtors in 2004 which appear to be the Debtors' attempt to settle what had then become their choate obligation under the Guarantee. Unfortunately, the facts reflect that although the Debtors were able to make a sizeable payment of $140,721.74 to Performance Funding after refinancing their home mortgage in September 2001, once Performance Funding discovered the diversion of the Server Group Eligible Accounts to Spec, rather than to it, that payment was not enough to pay Performance Funding in full.

10

The Court has analyzed the accounting prepared by Performance Funding in its most recent affidavits filed with the Court, and although Performance Funding must still clarify certain entries with the Court, it is clear that even if this Court accepts the Debtors' accounting of what remained unpaid after the Debtors' September 2001 payment, the Debtors still owed Performance Funding the amount of $11,754.99.[17] The Debtors have presented no evidence to reflect that they paid that remaining obligation. Under Arizona law, the Debtors must present some evidence to indicate that they have paid an obligation in full or the obligation has been satisfied. Rossi v. Stewart, 90 Ariz. 207 (Ariz. 1961) (court will look to reasonable evidence to determine when a claim has been discharged); Milberger v. Chaney Bldg. Co., Inc., 146 Ariz. 181 (Ariz. App., 1985) (evidence needs to be sufficient to establish valid tender or necessary acceptance to create accord and satisfaction to discharge the debt); Western Coach Corp. v. Rexrode, 130 Ariz. 93 (Ariz.App., 1981) (no right of subrogation to the creditor's rights in the collateral when there is no evidence that the entire debt was paid). The Debtors have not presented such evidence. As noted previously, the Debtors carry the burden of proof on any affirmative defenses which they have alleged. Because the Debtors have failed to meet their burden, the Court must enter judgment in favor of Performance Funding.

The final argument advanced by the Debtors is legal. The Debtors argue that they should be able to present evidence on whether Del Ray Plastering was in substantial compliance with the statute governing contractors, so that this Court might allow the Debtors to utilize the consideration received under the Contract entered into between Mr. Wallace and Del Ray Plastering as a setoff of any obligation owed by the Debtors under the Guarantee. As noted previously, this Court need not consider the Contract in its analysis. However, even if this analysis is incorrect, the Court concludes that the Debtors have misinterpreted the

---

**17** See Debtors' Response to the Motion for Summary Judgment, Docket Entry No.11, Exhibits attached thereto.

11

decision of <u>Aesthetic Property Maintenance, Inc. v. Capitol Indemnity Corp.</u>, 183 Ariz. 74, 900 P.2d 1210 (1995) upon which they rely.

In the Motion for Summary Judgment, Performance Funding relied on the decision of <u>Crowe v. Hickman's Egg Ranch, Inc</u>, 202 Ariz. 113 (App. 2002) for the proposition that absent a valid license, any contract entered into was not enforceable, even if the party so contracting knew that the contractor did not have a valid license. The Decision was predicated on a strict construction of A.R.S. §32-1153 which states as follows:

> No contractor as defined in § 32-1101 shall act as agent or commence or maintain any action in any court of the state for collection of compensation for the performance of any act for which a license is required by this chapter without alleging and proving that the contracting party whose contract gives rise to the claim was a duly licensed contractor when the contract sued upon was entered into and when the alleged cause of action arose.

Performance Funding argued that since the license of Del Ray Plastering was suspended at the time that it entered into the Contract with Mr. Wallace, the Debtors were unable to use any consideration received thereunder as a setoff. The Court agreed with this analysis at the April 11 hearing on the Motion for Summary Judgment.

The Debtors now advance the argument that the <u>Aesthetic Property</u> Decision changes this Court's April 11, 2005 ruling. The Arizona statute requires the licensing of contractors which perform construction and related services in Arizona above a certain dollar limitation "to protect the public from incompetent and irresponsible builders." <u>Id.</u>, 183 Ariz. at 77, citing <u>Koehler v. Donnelly,</u> 114 N.M. 363, 838 P.2d 980, 982. However, the Arizona Supreme Court set out certain factors in determining whether a contractor with a suspended license was in substantial compliance with the Arizona law so that it could recover under a contract. The factors to be considered are:

> [(1)] Is suspension by operation of law under Section 32-1125(A), or for cause under Section 32-1154(A)? Did the Registrar's failure contribute to the noncompliance? . . .
> [(2)] Was the contractor financially responsible while its license was suspended? A contractor does this by maintaining its liability insurance, surety bond, workers' compensation insurance, and any other requirement imposed by the Registrar.

12

> Failing that, there can be no substantial compliance.
> [(3)] Did the contractor knowingly ignore the registration requirements? If so, this is fatal to a claim of substantial compliance. . . .
> [(4)] Finally, did the failure to comply with our statute prejudice the party the statute seeks to protect?

Id., 183 Ariz. at 78. The Debtors have failed to present any documentation from Del Ray Plastering which would reflect that there is at least a triable issue of fact on the issue of substantial compliance. This Court is able to conclude, from the several affidavits submitted by the parties from the Arizona Registrar of Contractors, that Del Ray Plastering became a licensed contractor in Arizona in 1999. In April 2001, Del Ray had its license suspended briefly because it did not have the required bond under Arizona law. Even if the Court accepts the Debtors' argument that the Debtors forwarded a check for the renewal fee for Del Ray in June 2001, which the Registrar did not receive, the Debtors were placed on notice in July 2001, by the imposition of a late fee by the Registrar, that there were some problems with the license renewal. The Debtors have not presented any evidence that they resolved those issues with the Registrar. Assuming that the Registrar did make several errors in the license renewal, Del Ray's license was suspended again at the end of 2001 because Del Ray no longer had a responsible party to act on its behalf. Thus, as to factor one, it appears that the suspension in July 2001 by the Registrar was by operation of law.

As to the factor two, the Debtors have presented no evidence to show that Del Ray was financially responsible at the time. Although Del Ray had a bond, there is no information about liability insurance, workers' compensation, or other relevant information on finances to reflect that Del Ray was able to perform under the Contract.

It also appears that once the Debtors were notified, by way of a late fee, that there were problems with the renewal process, the Debtors did not seem to cure the various statutory deficiencies. Counsel for the Debtors stated that the Debtors just decided not to

13

renew Del Ray's license.  That inaction is not sufficient. The contractor must not knowingly ignore the registration requirements. The Debtors have not met factor three.

Finally, if the Court focuses on Mr. Wallace's affidavit, Del Ray could not perform under the Contract.  From Mr. Wallace's standpoint, Del Ray was "incompetent and irresponsible."  The statute was enacted to protect the public from such contractors. Since the Debtors are arguing substantial compliance with the statute, they needed to present some evidence that Del Ray performed in a timely, professional, and responsible manner as to the Contract.  They have not shown that. Factor four has not been met.

Because of the Debtors' failure to create a genuine issue of material fact on the issue of substantial compliance by Del Ray with the Arizona Registrar of Contractors statute, the Court concludes that the Debtors may not use the consideration paid under that Contract as a setoff.

D. The Performance Funding Accounting.

The Court does agree with the Debtors that their Motion to Amend should be granted in part, insofar as Performance Funding has not yet presented an accounting that this Court may utilize to enter judgment in its favor.

As stated in this Decision, the Court has found no document which is an Account Stated under the Agreement.  The only Exhibit which refers to the amount due and owing by the Debtors is a post-petition letter from counsel for Performance Funding to the Debtors.  Therefore, the Court agrees with the Debtors that in September 2001, when the Debtors made a payment in excess of $140,000, they were not being unreasonable in requesting that the invoices be paid in their numerical order since they all had the same date in June 2001.  The Court also agrees that there is no provision in the Agreement which requires that the Eligible Accounts be paid and accounted for in any specific manner.  As a result, the Debtors owed the sum of $11,754.99 after making the payment in excess of $140,000 in September 2001.  Moreover, the Late Charges, which accrued thereafter, would

14

be on the face amount of the last invoice, which was $52,953.50.[18] Therefore, Performance Funding needs to recompute the amount due and owing by the Debtors, taking into account the credit for services rendered by Mr. Ingram and Spec to Performance Restaurant in 2002.

Once Performance Funding recalculates its damages, it may then add its attorneys' fees and costs which have also been approved by this Court.

Performance Funding has also requested a Misdirected Payment Fee, but there is nothing in the record from 2001, 2002, or 2003, which reflects that Performance Funding ever requested such a fee. It is only as a part of this post-petition action to receive a portion of the proceeds that the Debtors received from the sale of their residence that the issue has surfaced. The Court will not grant such fee at this time. Performance Funding is requesting that its Motion be granted, and a judgment be entered as to the fee as a matter of law. However, the Court has insufficient information in the record to reflect that this fee has not been waived. Failure to properly raise an issue can result in it being waived. In re Marvin Props., Inc., 854 F.2d 1183, 1187 (9th Cir.1988). Waiver is defined as the voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of relinquishment of such right. City of Tucson v. Koerber, 313 P.2d 411 (Ariz. 1957). Performance Funding may be estopped from now making a claim for the Misdirected Payment Fee. Estoppel arises where one with knowledge of the facts has acted in a particular manner so that he ought not to be allowed to assert a position inconsistent with his former acts to the prejudice of others who have relied thereon .City of Tucson v. Koerber, 313 P.2d 411 (Ariz. 1957). As noted, there is no evidence that Performance Funding ever requested the fee prior to this action. As the claimant, it is Performance Fundings burden to prove to this Court that they are entitled to the fee and have not waived their entitlement to such fee.  Lundell v

---

**18** The Court has reviewed the Debtors' accounting attached to their Response to the Motion for Summary Judgment. However, that accounting uses an incorrect Late Charge in subsequently computing the amount due and owing by the Debtors.

15

Anchor Const. Specialist, Inc., 223 F.3d 1035 (9th Cir. 2000) (burden rests on the claimant to prove the validity of a claim).

### IV. CONCLUSION

Based on the foregoing, the Court concludes that the brief extension requested by the Debtors was not unreasonable, and therefore, the Motion to Extend will be granted. The Court has thoroughly reviewed counsel's for Performance Funding's fee application and invoices, and concluding that the amount requested is reasonable, hereby grants the Motion for Attorneys' Fees. Moreover, the Debtors' Motion to Amend will be granted, in part, and denied, in part for the various reasons set forth by the Court. Performance Funding is directed to submit its calculations regarding damages within 14 days of date of this Decision. If Performance Funding requests that it also receive the Misdirected Payment Fee, it needs to present further evidence to the Court at a hearing.

The Court incorporates its decision on the record on April 11, 2005, as to Performance Funding's Motion for Summary Judgment except as that decision has been modified by this Decision.

DATED this 28th day of September, 2005.

*[signature]*

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC TO NOTICE